# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **BRIDGETTE BURGIN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:07-CV-1425-RDP** |
| | } | |
| **TIM LAHAYE, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This case is before the court on Defendants' Motion for Summary Judgment (Doc. #113), filed June 29, 2009, and Defendants' Motion to Strike (Doc. #126), filed August 5, 2009. Both motions have been briefed and are now properly under submission.

## I.    Procedural History

On August 3, 2007, Plaintiff filed her initial complaint. (Doc. #1). In it, she named Tim LaHaye, Jerry Jenkins, Teri Boes, Christine Mersch, Brian Griffin, Joyce Harrison, and Jennifer Siler as Defendants. (Doc. #1). Essentially alleging copyright infringement, Plaintiff requested "justice and restitution on behalf of [herself], a writer, from all parties named . . . regarding the destruction of, copying of, and plagiarism of [her] manuscript (a 2-part novel), by turning over to [her] all monies gained from and derived from the selling of and the theft of [her] book(s), reimbursing [her] in total." (Doc. #1 at 9).

At the beginning of this litigation, Plaintiff was proceeding *pro se*.[1] Accordingly, on August 9, 2007, the court, concluding that her initial complaint failed to comply with the Federal Rules of

---

[1] To be sure, during the course of this case Plaintiff has alternately proceeded *pro se* and been represented by two firms. The court has attempted to accommodate her on several occasions, and sometimes to the palpable consternation of Defendants' counsel, the court did so in order to achieve a fair decision on the merits of this case.

Civil Procedure, granted her an additional forty-five days to replead her allegations.  (Doc. #3).  On September 20, 2007, Plaintiff submitted her amended complaint (Doc. #4).

On December 27, 2007, Plaintiff filed a motion to voluntarily dismiss with prejudice F+W Publications, Inc., Theresa Boes, and Christine Mersch (solely in her capacity as an employee of F+W Publications, Inc.).  (Doc. #27).  The court granted this request and dismissed the specified Defendants with prejudice.  (Doc. #36).  On the same day, the court, having been informed that Plaintiff had retained counsel, ordered her to file an amended complaint.  (Jan. 8, 2008 Order).

On January 14, 2008, Plaintiff filed her Second Amended Complaint in which she named the following Defendants: Tim LaHaye, Jerry Jenkins, Jennifer Siler, Joyce Harrison, Brian Griffin, and Christine Mersch.  (Doc. #38).  On February 18, 2008, Plaintiff filed a motion to amend her complaint and to voluntarily dismiss Defendants Brian Griffin, Jennifer Siler, and Joyce Harrison.  (Doc. #47).  The court granted Plaintiff's motion, dismissed the specified parties, and permitted Plaintiff to amend her complaint.  (Doc. #48).  In Plaintiff's Third Amended Complaint (Doc. #49), filed February 21, 2008, she named the following Defendants: Tim LaHaye, Jerry Jenkins, Christine Mersch, the University of Tennessee Press, and the Knoxville Writer's Guild (Doc. #49).

In April 2008, Defendants Knoxville Writer's Guild, University of Tennessee Press, and Christine Mersch separately filed motions to dismiss.  (Docs. #59, 61, 62).  In response, the court entered orders (Docs. #70, 73, 75) granting each motion.  After the entry of those orders, Plaintiff's lawsuit reached its current posture; specifically, the only remaining Defendants are Tim LaHaye and Jerry Jenkins, and the only claim remaining against them is for copyright infringement.  (Doc. #49; 3d Am. Compl. ¶¶ 51-63).

On June 29, 2009, Defendants Tim LaHaye and Jerry Jenkins filed their Motion for Summary Judgment.  (Doc. #113).  On July 20, 2009, Plaintiff filed her opposition.  (Docs. #117, 119).  On July 27, 2009, Defendants filed their reply submissions.  (Docs. #121, 122).

On the same day Defendants submitted their reply, Plaintiff filed her Motion to Correct Memorandum in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, in which Plaintiff requested leave "to correct previously filed memorandum, due to misspelled words, and also to clarify, and to specify wording."  (Doc. #124).  The court granted Plaintiff's request (July 30, 2009 Order), and on August 3, 2009, Plaintiff filed her Memorandum in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment.  (Doc. #125).  In response, on August 5, 2009, Defendants filed their Motion to Strike Plaintiff's Additional Memorandum.  (Doc. #126).  In particular, Defendants raised the following objections to Plaintiff's submission:

> 3.     Plaintiff's current pleading raises entirely new theories which are inconsistent with her discovery responses, and which now are asserted after defendants have briefed their summary judgment motion based on the existing state of discovery.  This is in violation of the Court's clear statement (Document 116) that "Defendants' concern about further amendments or changing theories is misguided.  There will be no further amendments to the pleadings in this case."
> 4.     Plaintiff's current pleading is based on hearsay, new theories, inadmissible statements, speculation and claims which she did not disclose in any of her responses to discovery (which discovery she already amended three times through so-called "supplemental responses").
> 5.     Plaintiff's factual statements are not only unsupported and inadmissible, they are false.  At this stage of the proceedings, it would be grossly unfair for defendants to have to carry the financial burden of producing new information to refute these unfounded and untimely-disclosed allegations.

(Doc. #126).

The court ordered briefing on the concerns raised in Defendants' motion.  (Doc. #127).

Defendants filed their initial submission on August 11, 2009 (Doc. #128), and Plaintiff filed her

responsive submission on August 20, 2009 (Doc. #130) and again on August 21, 2009 (Doc. #133).[2]

Defendants filed their reply submission on August 24, 2009 (Doc. #134) and summarized their

position:

> (a)     [Plaintiff's responsive submission] appears to re-argue the
> motion for summary judgment rather than address the motion to
> strike, and
> (b)     [Plaintiff's responsive submission] contains argument based
> on plaintiff's own views but which is not supported by any properly
> authenticated and submitted facts based on personal knowledge of
> witnesses from sworn testimony, depositions, pleadings and the like.

(Doc. #134).

## II.      Relevant Facts[3]

This case concerns Plaintiff's allegations that Defendants infringed on her copyrighted work.[4]

In particular, Plaintiff alleges that Defendants, in their books *The Rising* and *The Regime*, copied

elements of her manuscript, *The Final Call*.[5]  (Doc. #49; 3d Am. Compl. ¶¶ 51-63).

---

[2]It is unclear why Plaintiff submitted two briefs in opposition to Defendants' Motion to Strike.  Based on the court's review, aside from minor formatting changes, the documents are identical.  Thus, for purposes of this opinion, the court addresses only the initial submission (*i.e.*, Doc. #130).

[3]If facts are in dispute, they are stated in the manner most favorable to Plaintiff.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

[4]Plaintiff has also suggested that episodes of the television shows *Cold Case*, *Lost*, *24*, *House*, *Fringe*, and *Threshold* have copied *The Final Call*.  (Doc. #113-9,10; Pl. Dep. 139:3, 139:12-13, 139:15, 140:1-2, 143:5-10).

[5]In Plaintiff's response to Defendants' motion for summary judgment, in addition to *The Rising* and *The Regime*, Plaintiff contends that the following works by Defendants infringe on her copyright: (1) *The Europea Conspiracy*; (2) *Soon*; (3) *Apocalypse Burning*; (4) *Apocalypse Crucible*; and (5) "others."  (Doc. #119; Opposition to Summary Judgment at 3).  As Defendants correctly observe in their Motion to Strike, Plaintiff amended these claims out of the lawsuit when she filed her Third Amended Complaint.  (Doc. #49; 3d Am. Compl. ¶¶ 26-27).  Accordingly, the court considers only whether and to what extent Defendants' works, *The Rising* and *The Regime*, infringe on Plaintiff's copyright to *The Final Call*.

A.     **Relevant Works**

Plaintiff wrote *The Final Call* and registered the work with the U.S. Copyright Office on April 16, 2004.  (Doc. #49; 3d Am. Compl. ¶ 24).  The novel is unpublished.  Plaintiff's work concerns the Antichrist, named Eric Brasov in her novel, who is "a product of the cells of two different men and a mother who is from Romania, who is single, not married." (Doc. #113-9,10; Pl. Dep. 67:17-20).  The Antichrist figure, although not the offspring of Satan, is possessed by Satan after his birth.  (Doc. #113-9,10; Pl. Dep. 67:3-5).  Additionally, *The Final Call*'s female lead, Terri, is described as follows:

> . . . a . . . female scientist who is approached to create a clone, whose cells are provided to her by an . . . anonymous backer and a volunteer host provided by the anonymous backer. . . .  She is to keep it under contract in confidentiality.  She is an atheist, and . . . because of what she knows about the clone, after it grows up, she is killed at her home by henchmen representing the clone.  Her live-in servant . . . raises her son for her and with her and teaches him spiritual principles, raises him as a Christian against her wishes.

(Doc. #113-9,10; Pl. Dep. 98:8-22).  The story concludes with everyone dying, and Terri "converts to Christianity a few seconds before her death, and she's taken to Heaven.  And her son, her Navy Seal husband, her colleague . . . – they're all . . . in the heavens gathering the souls of all of those who Jesus Christ has judged at the final day." (Doc. #113-9,10; Pl. Dep. 99:4-15).

Defendants are the authors of the *Left Behind* series, which is a fictionalized "account of apocalyptic events described in the Bible, known as the Rapture and the Tribulation." (Doc. #113-4; Def. Jenkins Aff. ¶ 3).  The series "consists of 16 principal novels, including three prequels and one sequel, published between 1995 and 2007." (Doc. #113-4; Def. Jenkins Aff. ¶ 3).  Relevant to this litigation, "*The Rising* and *The Regime* are books 13 and 14 in the series (although the Biblical time

5

periods they cover are the earliest in the series)." (Doc. #113-4; Def. Jenkins Aff ¶ 3). Together, these two books function as prequels to the principal storyline in the *Left Behind* series. (Doc. #113-4; Def. Jenkins Aff. ¶ 6).

Defendant LaHaye developed the concept of the series in the 1970s and 1980s, and during this time, he sketched a general outline. (Doc. #113-4; Def. Jenkins Aff. ¶ 7). Around 1991, Defendants agreed to work together. (Doc. #113-4; Def. Jenkins Aff. ¶ 7). Defendants engaged in collaborative efforts to write each book in the series; in particular, "[Defendant LaHaye] originated the concept and had primarily [sic] responsibility to outline the contextual Scriptural material. He and [Defendant Jenkins] developed plots within the context of [their] understanding of the Biblical scriptures, and then [Defendant Jenkins] wrote the novels." (Doc. #113-4; Def. Jenkins Aff. ¶ 4). Defendants formally agreed to write *The Rising* on April 22, 2001, and they formally agreed to write *The Regime* on September 9, 2004. (Doc. #113-4; Def. Jenkins Aff. ¶ 6). Defendant LaHaye created the general outline for *The Rising* in early 2004 and for *The Regime* in mid-2004, and during the course of the year, Defendants formalized the details of each book. (Doc. #113-4; Def. Jenkins Aff. ¶ 7). In 2005, Defendants completed both books, which, during the same year, were published and released for wide distribution. (Doc. #113-4; Def. Jenkins Aff. ¶ 8).

## B. University of Tennessee Press's Peter Taylor Prize Competition

In 2004 and 2005, Plaintiff submitted an altered version[6] of her manuscript to be considered for the University of Tennessee Press's Peter Taylor Prize. (Doc. #113-11; Pl.'s Resp. to Interrog. #5). Plaintiff entered her manuscript in the science-fiction/thriller category of the competition.

---

[6]Although the submission was not identical to the copyrighted manuscript, Plaintiff claims that it was "substantially similar." (Doc. #113-11; Pl.'s Resp. to Interrog. #5). Specifically, according to Plaintiff, "[i]t differs mainly in terms of grammatical alterations, and not substantially in form." (Doc. #113-11; Pl.'s Resp. to Interrog. #5).

(Doc. #113-11; Pl.'s Resp. to Interrog. #5).  Although neither Defendant has ever been affiliated with the Peter Taylor Prize competition,[7] Plaintiff alleged that "[u]pon information and belief, the Knoxville Writer's Guild and the University of Tennessee Press, whose employees are intimate participants in the Peter Taylor Prize selection process, negligently entrusted [her] manuscript to unknown screeners," who then "supplied [the] manuscript to Defendants LaHaye and Jenkins, who then took characters, scenes, events, and paraphrased dialogue from the Plaintiff's manuscripts, and presented them to the public in the form of movies, television specials, books, audio books, and graphic novels for the purposes of pecuniary gain."  (Doc. #49; 3d Am. Compl. ¶¶ 44-45).

### C.    F+W Publication's Writer's Digest Competition

Similarly, in 2004 and 2005, Plaintiff participated in the F+W Publication's Writer's Digest competition.  (Doc. #113-11; Pl.'s Resp. to Interrog. #5). The Writer's Digest contest involves several constituent competitions organized by category.   During the relevant time period, the competition adhered to the following procedure:

> The submissions arrived in the mailroom, where they were sorted from the rest of the mail and sent to [Theresa Boes's] department (Promotions). [Ms. Boes] then sorted them by contest, processing the submissions by the deadline order of the contests. [Ms. Boes] checked each submission for compliance with the requirements of the entry form, to make sure all of the information had been provided (name, category, etc.).  When [Ms. Boes] got to a certain amount of entries, [she] sent a shipment to the first round judges; the entries were not all sent in a single shipment.  The judges then were given a certain amount of time to read the entries and make their decisions.  They sent the top ten picks to the editors, who forwarded them to the final round judges.  The second round judges were given a certain of time

---

[7]Defendant Jenkins stated that he has "never been connected in any way to The University of Tennessee Press, The Knoxville Writer's Guild, or The Peter Taylor Prize for the Novel competition."  (Doc. #113-4; Def. Jenkins Aff. ¶ 12).  Similarly, Defendant LaHaye stated that he has "never been connected in any way to The University of Tennessee Press, The Knoxville Writer's Guild, or The Peter Taylor Prize for the Novel competition."  (Doc. #113-4; Def. LaHaye Aff. ¶ 14).

> to decide, then they sent back 5, 3, or 1 – depending on the contest.
> The editors made the final decision of the top winner in each
> category.

(Doc. #113-13; Boes Aff. ¶ 5).  Not all of the competitions required multi-tiered judging; instead, some involved only one round.  (Doc. #113-13; Boes Aff. ¶ 5).  If submissions did not progress beyond the first round of judging, the competition's policies required their destruction by the first round judges.  (Doc. #113-13; Boes Aff. ¶¶ 9-10).

In 2004 and 2005, Plaintiff submitted to the Writer's Digest competition an excerpt of *The Final Call* – specifically, a portion[8] of Chapter 27.[9]  (Doc. #113-9,10; Pl. Dep. 127:9-12; and Doc. #113-12; Pl.'s Supp. Resp. to Interrog. #6; Pl.'s Supp. Resp. to Interrog. & Req. for Prod., Ex. A).  Although Plaintiff's broader work details cosmic struggles with overt religious dimensions, the section she submitted from Chapter 27 opens with an unelaborated murder investigation and proceeds to a romantic interlude between characters Terri and Mark.  (Doc. #113-12; Pl.'s Supp. Resp. to Interrog. & Req. for Prod., Ex. A).  The two dine at a Greek restaurant, owned by Mark's family, where Terri meets Mark's sister, Angela.  (Doc. #113-12; Pl.'s Supp. Resp. to Interrog. & Req. for Prod., Ex. A).  After concluding dinner, Terri and Mark stroll through a nearby park.  (Doc. #113-12; Pl.'s Supp. Resp. to Interrog. & Req. for Prod., Ex. A).  Mark suggests that they take a

---

[8]According to Plaintiff's initial responses to Defendants' interrogatories, she submitted "Chapter One (1), Seventeen (17), and others" to the Writer's Digest competition.  (Doc. #113-11; Pl.'s Resp. to Interrog. #6).  Nevertheless, in her supplemental responses, she amended her initial response and indicated that she submitted only an eleven-page excerpt of Chapter 27, which she attached as Exhibit A.  (Doc. #113-12; Pl.'s Supp. Resp. to Interrog. #6).

[9]In fact, the portion excerpted from Chapter 27 of *The Final Call* began "about three pages into the chapter right in the middle of a paragraph."  (Doc. #113-9,10; Pl. Dep. 125:15-19).  When asked why Plaintiff "start[ed] in the middle of a chapter and the middle of a paragraph for something that [she] sent in for the competition," Plaintiff responded,

> For effect.  If I'm going to get your attention and let you know that I've written
> something that might be interesting to follow, don't you think, "Mark thought that
> Ashley was killed because of what she knew" might be something that you might
> want to read further and find out what Ashley knew?

(Doc. #113-9,10; Pl. Dep. 127:13-23).

carriage ride, and Angela assents.  (Doc. #113-12; Pl.'s Supp. Resp. to Interrog. & Req. for Prod., Ex. A).  During the course of the ride, they exchange flirtatious banter, and then the story concludes. (Doc. #113-12; Pl.'s Supp. Resp. to Interrog. & Req. for Prod., Ex. A).

For both years, Plaintiff submitted her excerpted work to the Writer's Digest competition in the following three categories: romance, thriller and suspense, and science-fiction/fantasy.  (Doc. #113-11; Pl.'s Resp. to Interrog. #1).  Plaintiff's submissions did not progress beyond the first round in either year.  (Doc. #113-13; Boes Aff. ¶ 6).  Although Defendant LaHaye has neither judged nor been affiliated with the Writer's Digest competition, Defendant Jenkins, from 2003 until 2007, judged only the inspirational writing category's second round.  (Doc. #113-5; LaHaye Aff. ¶ 13; and Doc. #113-4; Jenkins Aff. ¶ 11).  Plaintiff, however, did not submit the work in question in the inspirational writing category.  (Doc. #113-11; Pl.'s Resp. to Interrog. #6).  Indeed, "[n]either *The Final Call* nor any other work by [Plaintiff] was included in the entries sent to [Defendant Jenkins]" by the Writer's Digest staff.  (Doc. #113-4; Def. Jenkins Aff. ¶ 11).

## III.   Summary Judgment Standard[10]

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-

---

[10]Although "[s]ome courts have observed that summary judgment is peculiarly inappropriate in copyright infringement cases due to their inherent subjectivity," the Eleventh Circuit has rejected this approach and concluded summary judgment to be appropriate when the traditional requirements for the standard are satisfied.  *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994); *see also Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1247 (11th Cir. 1999) ("[N]on-infringement may be determined as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.") (citations omitted).

movant." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993)). In making this assessment, the court must view the evidence "in the light most favorable to the nonmoving party." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1357 (11th Cir. 1999)). But while that is the case, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'" *Mize*, 93 F.3d at 743 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 592-94 (1986)).

Alternatively, there is no genuine issue of material fact if "the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Jones v. Gerwens*, 874 F.2d 1534, 1538 (11th Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986)). Consequently, the court "must view the evidence presented through the prism of the [movant's] substantive evidentiary burden." *Celtoex Corp.*, 477 U.S. at 254.

To respond, the nonmoving party "may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." FED. R. CIV. P. 56(e)(2). Importantly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

10

**IV.     Copyright Framework**

To establish a *prima facie* case of copyright infringement, Plaintiff must prove "(1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (citing *Harper & Row, Publishers v. Nation Enters.*, 471 U.S. 539, 548 (1985)).  Plaintiff may prove copying through either direct or circumstantial evidence.  *Donald Frederick Evans & Assocs., Inc. v. Cont'l Homes, Inc.*, 785 F.2d 897, 904 (11th Cir. 1986) (citation omitted).  Because direct evidence of copying is rarely available, Plaintiff may circumstantially prove copying by showing (1) "the defendant had access to the work" and (2) "the defendant's work is substantially similar to the plaintiff's." *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir. 1982) (citing *Miller v. Universal City Studios*, 650 F.2d 1365, 1375 (5th Cir. 1981); *Ferguson v. Nat'l Broad. Co., Inc.*, 584 F.2d 111, 113 (5th Cir. 1978)).  "Proof of access and similarity is not enough, however, to affirmatively establish infringement.  These elements only raise a presumption of infringement which may be rebutted by proof of [Defendants'] independent creation of the allegedly infringing [work]." *Benson v. Coca-Cola Co.*, 795 F.2d 973, 974 (11th Cir. 1986) (citing *Original Appalachian Artworks, Inc.*, 684 F.2d at 829).

If Plaintiff cannot show access, she "may, nonetheless, establish copying by demonstrating that [her] original work and the putative infringing work are strikingly similar." *Corwin v. Walt Disney World Co.*, 475 F.3d 1239, 1253 (11th Cir. 2007) (citing *Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1232 n.6 (11th Cir. 2002)).  The Eleventh Circuit explained that "[s]triking similarity exists where the proof of similarity in appearance is 'so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded.'" *Id.* (quoting

11

*Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir. 1984); citing M. NIMMER & D. NIMMER, 4 NIMMER ON COPYRIGHT § 13.02[B]).  In other words, the allegedly infringing work and the copyrighted work are so similar "that the only possible explanation is copying."  *Benson*, 795 F.2d at 975 n.2.

## V.    Discussion

Defendants concede the fact that Plaintiff owns a valid copyright covering *The Final Call*. (Doc. #113-2; Memorandum Supporting Motion for Summary Judgment at 13).  The only issue for the court to decide, therefore, is whether summary judgment is proper with respect to the second element of the *prima facie* case – specifically, whether Defendants copied constituent elements of Plaintiff's work that are original.

Plaintiff must resort to circumstantial proof of copying because she has not identified any direct evidence.  (Doc. #113-11; Pl.'s Resp. to Interrog #17; and Doc. #113-12; Pl.'s Supp. Resp. to Interrog. #17).  Accordingly, summary judgment in favor of Defendants is warranted unless Plaintiff can point to substantial evidence that:  (1) Defendants had access to Plaintiff's work; and (2) Defendants' works and Plaintiff's work are substantially similar.  For the reasons set forth below, the court concludes that Plaintiff has not met her burden of production for either prong.

### A.    Neither Defendant had access to Plaintiff's entire manuscript

To establish access, Plaintiff must show that Defendants had a "reasonable opportunity to view" the copyrighted material.  *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1249 (11th Cir. 1999) (citing *Ferguson*, 584 F.2d at 113).  A reasonable opportunity to access the material is more than a "bare possibility" or "mere speculation or conjecture."  *Id.* (citing *Ferguson*, 584 F.2d at 113; M. NIMMER & D. NIMMER, 4 NIMMER ON COPYRIGHT § 13.02[A]).

12

Plaintiff has not submitted evidence suggesting Defendants had access to her entire manuscript. The only writing competition to which Plaintiff submitted her entire manuscript was the University of Tennessee Press's Peter Taylor Prize. (Doc. #113-12; Pl.'s Supp. Resp. to Interrog. ##5-6). Regarding this competition, Plaintiff asserted, "upon information and belief," that "the Knoxville Writer's Guild and the University of Tennessee Press, whose employees are intimate participants in the Peter Taylor Prize selection process, negligently entrusted [her] manuscript to unknown screeners." (Doc. #49; 3d Am. Compl. ¶ 44). From this allegation, Plaintiff claimed, again "upon information and belief," that "these screeners supplied [her] manuscript to Defendants . . . , who then took characters, scenes, events, and paraphrased dialogue from [her] manuscripts, and presented them to the public in the form of movies, television specials, books, audio books, and graphic novels for the purposes of pecuniary gain." (Doc. #49; 3d Am. Compl. ¶ 45).

Neither Defendant has ever been affiliated with this particular competition. (Doc. #113-4; Def. Jenkins Aff. ¶ 12; and Doc. #113-5; Def. LaHaye Aff. ¶ 14). Plaintiff, attempting to supply a link, has suggested that "[Defendant Jenkins's] connection is through [Christine] Mersch Den Herder, who was connected to the Taylor Prize as both a reader and a judge. Both Mr. Jenkins and Ms. Den Herder, acknowledged that they have communicated with one another." (Doc. #125; Memorandum Supporting Opposition to Summary Judgment at 2). Presumably, although not specifically alleged by Plaintiff, Den Herder is the "unknown screener" noted in the Third Amended Complaint. (Doc. #49; 3d Am. Compl. ¶ 44). Plaintiff's proposed link, however, rests on three assumptions that simply have no support in the Rule 56 file: (1) Den Herder was affiliated with the Peter Taylor Prize; (2) Den Herder, in that capacity, supplied Defendant Jenkins with a copy of

Plaintiff's full manuscript; and (3) Defendant Jenkins, once he received the copy, shared it with Defendant LaHaye.  The court will address each of these unsupported assumptions in turn.

First, although Den Herder was previously affiliated with the Writer's Digest competition, she has never been involved, either formally or informally, with the Peter Taylor Prize.[11]  Second, the only factually supported communication between Den Herder and Defendant Jenkins concerned administrative details unrelated to Plaintiff's allegation.  Specifically, the only known interaction between the two that is reflected in the Rule 56 record involved an e-mail of unknown contents. (Doc. #119-8; Den Herder Dep. 17:5-19).  Further, based on the uncontroverted deposition testimony, that communication related to the Writer's Digest competition – not the Peter Taylor Prize:

> Q.     Have you ever spoken with Tim LaHaye?
> A.     No.
> Q.     How about Jerry Jenkins?
> A.     Not personally.  I may have sent him an E-mail in the past.
> Q.     What was the E-mail regarding?
> A.     It would have just been deadlines about when to submit his final entries or final picks for the top – top prizes.
> Q.     So, it's your understanding he was a judge in that F&W competition as well?
> A.     That's what I remember in '04 when I worked there.

(*Id.*)

---

[11]In the deposition of Christine Den Herder, excerpts of which Plaintiff submitted with her Memorandum in Opposition to Defendants' Motion for Summary Judgment, the following exchange occurred:

> Q.     Okay.  What is the Peter Taylor Prize?
> A.     I don't know.
> Q.     So, you're not familiar with anything called the Peter Taylor Prize?
> A.     No.
> Q.     Okay.  Have you ever done anything with the University of Tennessee with regard to publishing or the Peter Taylor Prize?
> A.     No.

(Doc. #119-8; Den Herder Dep. 13:5-15).

Finally, even assuming that Defendant Jenkins obtained from Den Herder a copy of Plaintiff's manuscript, Plaintiff has not submitted any evidence suggesting that Defendant Jenkins shared it with Defendant LaHaye.

Accordingly, after reviewing the evidence purportedly establishing a nexus between Defendants and the Peter Taylor Prize, the court concludes that the allegations contained in the Third Amended Complaint are without factual support.  Instead, the allegations linking Defendants to the Peter Taylor Prize remain, as initially set out, uncorroborated assertions resting upon Plaintiff's "information and belief."  (Doc. #49; 3d Am. Compl. ¶¶ 44-45).  At this juncture, however, bare allegations in the complaint are insufficient to satisfy Plaintiff's burden of production.  Thus, the submitted evidence fails to show that Defendants had access to the entire manuscript via the Peter Taylor Prize competition.

**B.     Neither Defendant had access to an excerpt of Plaintiff's manuscript**

The only potential access point, seemingly documented and relevant to this litigation, is Plaintiff's submission of a portion of her manuscript to the Writer's Digest competition.  In 2004 and 2005, Plaintiff entered an eleven-page excerpt from *The Final Call* in the following categories: romance, thriller and suspense, and science-fiction/fantasy.

Defendant LaHaye has never been connected with the Writer's Digest competition. Defendant Jenkins, on the other hand, from 2003 until 2007 judged the second round of the competition's "Inspirational Writing (Spiritual/Religious)" category.   In this limited capacity, Defendant Jenkins reviewed the top ten or eleven entries, which others selected and the competition's personnel forwarded to him.  For both years, Plaintiff's submission was not entered in this competitive category and was not included in the batch of entries forwarded to Defendant

15

Jenkins.  Nevertheless, because Defendant Jenkins judged the competition in 2004 and 2005, the evidence requires closer examination.

Essentially, Plaintiff's argument is that, because one set of readers had access to her submission, Defendant Jenkins had access as well.  This argument is wholly unsupported by the summary judgment evidence before the court.  Further, the argument is far beyond the limits of any reasonable inference the court can make.  The Eleventh Circuit addressed proof of access premised on circumstantial evidence in *Benson v. Coca-Cola Co.*, 795 F.2d 973 (11th Cir. 1986).  In *Benson*, the plaintiff claimed that the defendant's commercial illegally copied the plaintiff's copyrighted music.  *Id.* at 974.  The plaintiff copyrighted his song in 1960 and, for the next five to six years, began distributing it to various entertainers and record companies.  *Id.*  In 1971, the defendant launched its commercial that included music which allegedly copied the plaintiff's copyrighted material.  *Id.*  The district court granted the defendant's motion for a directed verdict[12] on various grounds, including the plaintiff's failure to prove access.  *Id.*  In support of his claim that the defendant had access to his music, the plaintiff contended that

> [The defendant's] principal songwriters had access because both traveled extensively in the United States at the same time [the plaintiff] publicized his song through performances in various nightclubs, hotels and restaurants.  One of [the defendant's] writers also had been a record company executive during the time [the plaintiff] had sent copies of his song to various music publishers and record companies. . . . [The plaintiff's] evidence of publication concerned performance of his song primarily in Hollywood, Fort Lauderdale and Miami, Florida.  Isolated performances also occurred at a New Jersey restaurant, a New York Catskill resort, and a

---

[12]Although this case and *Benson* are postured differently (*i.e.*, this matter is before the court on a motion for summary judgment whereas the *Benson* court considered the propriety of a motion for directed verdict), as the Supreme Court explained, the summary judgment standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a) . . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

> restaurant in San Raphael, California. [The plaintiff's] wife testified
> that most of these performances occurred in the early 1960s. [The
> plaintiff] produced no evidence that [the defendant's] songwriters
> visited any of the places of performance during the relevant time
> period. Although one of the writers . . . was in charge of developing
> repertoire materials for the Chess Record Company between 1961 and
> 1969, [the plaintiff] never sent a copy of his song to [that company].
> There is no evidence that any other record company receiving a copy
> of [the plaintiff's] song forwarded it to Chess Records.

*Id.* at 975. The Eleventh Circuit, agreeing with the district court, held that this evidence was insufficient to "establish[] 'a reasonable possibility' that [the defendant's] writers had access." *Id.* (citing *Selle v. Gibb*, 741 F.2d 896 (7th Cir. 1984)).

Here, Plaintiff has not produced any evidence that someone from the Writer's Digest competition supplied either Defendant with a copy of her submission. Defendant Jenkins stood in a position akin to the writer in *Benson* who worked for a record company, although not a record company to which the plaintiff had submitted a copy of his music. Like separate record companies, the various categorized competitions under the Writer's Digest umbrella operated independently of one another. Even within each categorized competition, the multi-tiered judging further compartmentalized the accessibility of submitted works. Indeed, the competition's policy required the first round judges to destroy all non-advancing manuscripts. Plaintiff's submissions never advanced beyond the first round, and Defendant Jenkins never judged the first round. Accordingly, because Plaintiff has failed to demonstrate, or even to raise suspicion, that one of the preliminary round judges (from an altogether separate competitive category) (1) disregarded the competition's policy requiring manuscript destruction and (2) forwarded a copy of Plaintiff's submission to Defendant Jenkins, she has not produced evidence sufficient to show access. In short, the standard for access is a reasonable opportunity to view the copyrighted material. Plaintiff's argument,

however, misses the mark and does not demonstrate Defendant Jenkins, or even Defendant LaHaye through Defendant Jenkins, had such an opportunity.

Alternatively, even assuming that Plaintiff has raised an inference that Defendants had access to the eleven-page excerpt from *The Final Call* (and, again she has <u>not</u>), extrapolating from this inference that Defendants also had access to the entire manuscript is another separate unreasonable inference not supported by the Rule 56 file.  In particular, reaching this conclusion (*i.e.*, that Defendants eventually obtained the full manuscript) would require the court to string together the following inferences: (1) Defendant Jenkins read the eleven-page submission; (2) Defendant Jenkins gleaned from the eleven-page submission that the broader story from which it was extracted contained plot points compatible with the *Left Behind* series;[13] (3) Defendant Jenkins discovered that *The Final Call* was copyrighted[14] and, therefore, accessible via the Library of Congress's Copyright Office;[15] (4) Defendant Jenkins retrieved a copy of *The Final Call* from the Library of Congress's Copyright Office; (5) Defendant Jenkins read *The Final Call*; and (6) Defendant Jenkins shared his

---

[13]As discussed more fully below in the context of substantial similarity, reviewing only the eleven-page submission, it would have been virtually impossible to discern the overarching plotline of *The Final Call*.

[14]This component of the assumption – that Defendant Jenkins discovered that *The Final Call* was copyrighted – is particularly problematic.  Plaintiff has not submitted any evidence to suggest that her submission bore a copyright symbol or otherwise designated the work as having been copyrighted.  Indeed, the copy of the eleven pages submitted in this litigation does not contain such a designation.  (Doc. #113-12; Pl.'s Supp. Resp. to Interrog. & Req. for Prod., Ex. A).  Thus, Defendant Jenkins's ability to discern that Plaintiff had excerpted the material from a copyrighted document is factually unsupported.

[15]Nothing in the record suggests that *The Final Call* is published.  Plaintiff has not presented evidence that any other person or organization, aside from herself, the Library of Congress, and the University of Tennessee Press's Peter Taylor Prize competition, has a copy of the book.  Moreover, as discussed, the evidence is insufficient to support the conclusion that Defendants obtained a copy from the University of Tennessee Press's Peter Taylor Prize competition.  Accordingly, Defendants could only have retrieved a copy from the Library of Congress or from Plaintiff herself.  Because Plaintiff has not claimed that she gave a copy of *The Final Call* to Defendants, the only possible source would have been from the Library of Congress.  But even given that overly generous process of elimination, there is nothing before the court to suggest that either Defendant obtained a copy of *The Final Call* from the Library of Congress (or any other source).

discovery with Defendant LaHaye.  Certainly, the court must consider all reasonable inferences in favor of Plaintiff. But none of these inferences is reasonable here because none of them are supported by the summary judgment record.  And when the court is required to construct an elaborate web of wholly unsupported inferences such as those just outlined, the inference has ceased to be reasonable.

The Fifth Circuit's decision in *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111 (5th Cir. 1978)[16] bolsters this conclusion.  In *Ferguson*, the plaintiff composed and copyrighted a song in 1953.  *Id.* at 112.  The song was not commercially sold, published, or generally circulated. *Id.*  Instead, the plaintiff sent a copy of the song to six publishers, and none of them expressed interest.  *Id.*  In fact, each publisher returned the submitted copy to her.  *Id.* at 113.  Alleging that the theme song for a 1973 television show copied her composition, the plaintiff sued NBC for infringement.  *Id.* at 112.  The composer of the theme song stated that, although he had "some contacts with [one of the publishers to whom the plaintiff sent her song] . . . these contacts were not related to either the plaintiff or her composition."  *Id.* at 113.  Moreover, the composer stated that "he had never heard of the plaintiff or her composition prior to" the lawsuit.  *Id.*  The plaintiff did not contradict this statement.  *Id.*  According to these facts, the Fifth Circuit, holding that summary judgment was proper because evidence of access was absent, explained the basis for its decision:

> To find that [the composer] had access, we would have to assume that (1) although [the publisher with whom the composer had prior contact] professed no interest in plaintiff's composition and returned the original to her, it made and kept a copy which it later allowed [the composer] to see, and (2) [the composer] was lying when he said he had never heard of the plaintiff's composition.  Plaintiff has given us no reason to believe that either of these assumptions is true, and

---

[16]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

> certainly they are not obviously compelling. Thus, a finding of access
> in this case would be based on speculation or conjecture, and this is
> impermissible.

*Id.* (citing 3 M. NIMMER, COPYRIGHT § 13.02(A) (1978)).   *Ferguson*, therefore, requires

substantiated proof of access as opposed to mere guesswork or bare allegations of conspiracy.

As described above, however, the only way to reach the conclusion that Defendants accessed

Plaintiff's full manuscript is to engage in unfounded speculation, bordering on a variation of the "Six

Degrees of Kevin Bacon," and this *Ferguson* forbids.  *Id.*; *see also Fletcher v. ADT Sec. Servs.*, No.

1:99-CV-504, 2000 U.S. Dist. LEXIS 20380, at *32 (N.D. Ga. July 13, 2000) ("While a court must

make all reasonable inferences in favor of the nonmovant on a summary judgment motion, inferences

based on speculation and conjecture need not be made.") (citing *Rollins v. TechSouth, Inc.*, 833 F.2d

1525, 1529 (11th Cir. 1987); *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir.

1982)).  Accordingly, the evidence is insufficient to justify the conclusion that Defendants had access

to Plaintiff's entire manuscript.

### C. The relevant works do not share substantial similarities

Compared works share a substantial similarity "where an average lay observer would

recognize the alleged copy as having been appropriated from the copyrighted work."  *Original*

*Appalachian Artworks, Inc.*, 684 F.2d at 829. "To establish substantial similarity, a plaintiff must

satisfy a two-pronged test: an extrinsic, or objective test and an intrinsic or subjective test." *Herzog*,

193 F.3d at 1257 (citing *Beal v. Paramount Pictures*, 806 F. Supp. 963, 967 (N.D. Ga. 1992), *aff'd*,

20 F.3d 454 (11th Cir. 1994)).  "Under the extrinsic test, a court will inquire into whether, as an

objective matter, the works are substantially similar in protected expression."  *Id.* (citing *Beal*, 20

F.3d at 461-64).  "As part of this test, a court will determine whether a plaintiff seeks to protect only

uncopyrightable elements; if so, the court will grant summary judgment for defendant." *Id.* (citing *Beal*, 20 F.3d at 461-64). This inquiry must be keyed to the "similarity of expression, *i.e.*, material susceptible of copyright protection." *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1224 (11th Cir. 2008); *see also Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1214 (11th Cir. 2000) ("[T]he plaintiff . . . must establish specifically that the allegedly infringing work is substantially similar to the plaintiff's work with regard to its protected elements.") (citations omitted). The Eleventh Circuit clarified the divide between non-copyrightable ideas and copyrightable expression:

> At one end of the spectrum, *scenes a faire* – the stock scenes and hackneyed character types that naturally flow from a common theme – are considered "ideas," and therefore are not copyrightable. But as plots become more intricately detailed and characters becomes more idiosyncratic, they at some point cross the line into "expression" and are protected by copyright.

*Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1266 (11th Cir. 2001) (citations omitted). Under the second prong of the test for substantial similarity, "a court will determine whether, upon proper instruction, a reasonable jury would find that the works are substantially similar." *Herzog*, 193 F.3d at 1257 (citing *Beal*, 806 F. Supp. at 967). "A court may grant summary judgment for defendant as a matter of law if the similarity between the two works concerns only non-copyrightable elements of the plaintiff's work or if no reasonable jury would find that the two works are substantially similar." *Id.*

For purposes of this particular analysis, the court assumes that Defendants had access only to the eleven-page excerpt from *The Final Call*.[17] Thus, the relevant works to compare are the

---

[17] As discussed above, Plaintiff has not produced any evidence connecting Defendants to the Peter Taylor Prize, and Plaintiff's suggestion that, prompted by the eleven-page submission, Defendants retrieved a copy of the full manuscript, is untenable. Although the court concludes that the evidence does not support an inference of access even with respect to the eleven-page submission, the court assumes for this limited purpose that Plaintiff has shown Defendants to have obtained and read that submission. In short, summary judgment is appropriate because Plaintiff has not shown

excerpt from Chapter 27 of *The Final Call* on the one hand, and *The Rising* and *The Regime* on the other.

Plaintiff generally identified three categories of similarity: (1) characters; (2) point of view; and (3) plot points.  First, regarding similar characters, Plaintiff claimed that the characters Terri and Meg, both from *The Final Call*, bear similarities to Marilena, the main character from *The Rising* and *The Regime*:

> "Terri" is one of the main characters in the *Final Call*.  Terri is a private person who speaks multiple languages.  She is also a single mother who is charged with creating a child from the DNA of two males by a bio-genetics company.  Terri gives birth to the anti-Christ who then turns against her.  Ultimately at her son's direction, Terri is killed in her home and has a Christian revelation before her death.

> "Meg" is one of the main characters in the *Final Call*.  She is also a single mother who is utilized (by a bio-genetics company) to bear a child, created from the DNA of two males, who is the anti-Christ. She is also a private person who speaks multiple languages and is Romanian-born.  Ultimately at her son's direction, Meg is killed in her home and has a Christian revelation before her death.

> "Marilena" is a main character in *The Rising* and *The Regime*. . . . As with Meg and Terri, Marilena is single (divorced like Terri) and charged with bearing a child by a bio-genetics company, and is inseminated by 2 male DNA specimens.  Marilena is also a private person who speaks multiple languages and is Romanian-born. Ultimately, as a result of her son's birth, Marilena is killed in her home and has a Christian revelation before her death.

(Doc. #113-11; Pl.'s Resp. to Interrog. #14).  In addition to these overlaps, Plaintiff described two other character similarities between her work and Defendants' works:

> [T]here is remarkable similarity between the characters of "Aldrige Von Claus" of *The Final Call* and "Sorin Carpathia" of *The Rising*.

---

access.  The court examines substantial similarity as an alternative basis for its summary judgment analysis.  Again, to be clear, this assumption is for *arguendo* purposes only because there is no Rule 56 evidence to support that proposition.

> Both characters are (1) odd in physical appearance; (2) the father of the anti-Christ; (3) killed by the anti-Christ; and (4) attends [sic] secret meetings.

> [T]here is a remarkable similarity between the characters of "Richard Stevanski" of *The Final Call* and "Jonathan Stonagal" of *The Rising*. Both characters are (1) multi-billionaire funder of cloning project which leads to birth of anti-Christ; and (2) head of secret society for the wealthy.

(Doc. #113-11; Pl.'s Resp. to Interrog. #14).  Second, regarding point of view, Plaintiff claimed that *The Rising* and *The Regime*, like *The Final Call*, are told from "an atheistic point of view" (*i.e.*, lead characters who are atheists).  (Doc. #113-11; Pl.'s Resp. to Interrog. #15).  Third, in terms of plot points, Plaintiff noted five parallels between Plaintiff's work and Defendants' works:

> (1) the creation of the unborn baby which does not move in the womb; (2) male donors; (3) a main character who is a single . . . woman who is ultimately murdered by her anti-Christ son after she is no longer useful; (4) a main character who is an atheist and who is in conflict with the spiritual teachings which her live-in house-keeper imparts on her son; and (5) an anonymous party (a biogenetic laboratory) who financially support the single female main character.

(Doc. #113-11; Pl.'s Resp. to Interrog #16).  Additionally, presumably under the heading "plot points," Plaintiff identified the following overlaps:[18]

> 29.    Female leads who are impregnated by a demon.
> 30.    Women who meet at a foreign restaurant within a large city.
> 31.    At the restaurant, the women discuss their willingness to participate in the artificial insemination process, which results in a living fetus.
> 32.    The pregnancies result in living, viable fetuses, yet which do not move in the womb for the entire duration of the pregnancy.

---

[18] Plaintiff mentioned these similarities in her Third Amended Complaint. (Doc. #49; 3d Am. Compl. ¶¶ 29-41).  During the course of discovery, however, Plaintiff focused instead on those similarities previously mentioned and did not specifically address these points again.  For the sake of completeness, the court includes these allegations in its treatment of the similarity analysis.

33.    White at the restaurant, the authors make a point of noting that the women drink their wine too quickly while discussing the insemination.

34.    The women sign contracts with an anonymous backer who furnishes a lab, sperm and financial support while requesting confidentiality.

35.    As compensation, the women receive living quarters and stipends.

36.    While pregnant, the women make telephone calls to churches requesting advice, and leave messages.

37.    As they wait to hear back from the churches, they are attacked by male assassins with whom they were previously acquainted.

38.    Both the women and assassins die, and the women pray before their eventual deaths.

39.    Dark anthropomorphic clouds chase and terrorize the main characters.

40.    One leading character includes an African-American male who has killed in his past, yet defends helpless children.

41.    Antagonists called "The Others" target the vulnerable and defenseless.

(Doc. #49; 3d Am. Compl. ¶¶ 29-41).

Regarding these details, the Eleventh Circuit cautioned that "[l]ists of similarities between the two works are 'inherently subjective and unreliable,' particularly where the list contains random similarities, and many such similarities could be found in very dissimilar works." *Herzog*, 193 F.3d at 1257 (quoting *Beal*, 20 F.3d at 460); *see also Williams v. Crichton*, 84 F.3d 581, 590 (2d Cir. 1996) (lists of random similarities held not probative of substantial similarity because such lists fail "to address the underlying issue of whether a lay observer would view the works as a whole substantially similar to one another"). Because of this concern, the court "must compare the works in question." *Herzog*, 193 F.3d at 1257 (citing *Beal*, 20 F.3d at 456).

The court has reviewed Plaintiff's eleven-page submission to the Writer's Digest competition. The short excerpt from *The Final Call* does not contain a single character trait, point

24

of view, or plot detail designated by Plaintiff as having been copied by Defendants.  In particular,

at no point in this submission were the following referenced, either directly or implicitly: (1) Terri's

spiritual beliefs (or lack thereof), her ability to speak multiple languages, or her eventual fate in *The*

*Final Call*; (2) the Antichrist; (3) biogenetic conspiracies; (4) human cloning; (5) artificial

insemination; (6) secret societies; (7) Terri's housekeeper and the housekeeper's religious

convictions; (8) the Aldridge Von Claus or Richard Stevanski characters; (9) dark anthropomorphic

clouds; (10) assassins; or (11) a group called "The Others."  At best, the only detail contained in

Defendants' works that also appears in Plaintiff's submission is a female lead who is single.  The

unremarkable relationship status of a character, however, is not protectable and, hence, not

copyrightable.  *See Herzog*, 193 F.3d at 1259 (holding that broad character traits are not subject to

copyright protection).  Accordingly, even to the extent that the works share this commonality, it is

an insufficient basis for finding actionable similarity.  *See Leigh*, 212 F.3d at 1214 ("[T]he plaintiff

also must establish specifically that the allegedly infringing work is substantially similar to the

plaintiff's word with regard to *its protected elements*.") (citations omitted)); *see also Thompson v.*

*Looney's Tavern Prods.*, 204 Fed. App'x 844, 848 (11th Cir. 2006) ("[F]or similarity to be

substantial, and hence actionable, it must apply to more than simply a *de minimis* fragment.")

(quoting 2 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT § 8.01[G] (2002)).

Moreover, Plaintiff has never claimed that *The Rising* or *The Regime* contain any characters

or plot points similar to those present in the eleven-page excerpt of *The Final Call* submitted to the

Writer's Digest competition.  In fact, the submitted portion, excerpted from Chapter 27, does not

incorporate, according to Plaintiff, a single detail copied by Defendants.  Plaintiff listed the

following chapters of *The Final Call* as involving character descriptions or plot points copied by

Defendants: Chapters 1, 2, 3, 4, 10, 12, 13, 14, 16, 21, 28, 30, 31, 33, 42, and 49.  (Doc. #113-12; Pl.'s Supp. Resp. to Interrog. ##14-15).  Noticeably absent, however, is any reference to Chapter 27 or, even more importantly, any reference to the series of events contained in the eleven pages submitted to the Writer's Digest competition.  Based on the submitted evidence, the court concludes that no triable issue of fact exists because no reasonable juror could find similarity (much less, substantial similarity) between Plaintiff's submission to the Writer's Digest competition and Defendants' novels, *The Rising* and *The Regime*.  Summary judgment, therefore, is appropriate because evidence of substantial similarity is a necessary condition for circumstantial proof of copying.

### D.    Independent Creation

As the Eleventh Circuit observed, "in the realm of copyright, identical expression does not necessarily constitute infringement."  *Calhoun*, 298 F.3d at 1232.  Specifically, even if Plaintiff raised a presumption of copying by showing access and substantial similarity (and again, to be clear, she has not), Defendants may rebut that presumption with evidence of independent creation.  *Original Appalachian Artworks, Inc.*, 684 F.2d at 829.  Indeed, uncontradicted evidence of independent creation not only rebuts the presumption but altogether negates infringement liability.  *Benson*, 795 F.2d at 975; *see also Simmons v. Western Publ'g Co.*, 834 F. Supp. 393, 396-97 (N.D. Ga. 1993) (granting summary judgment, even though triable issues existed, because of the defendant's uncontradicted evidence of independent creation).  For purposes of completeness, the court will evaluate this factor.

Although both Defendants acknowledge that they conceptualized the series before Plaintiff's copyright and published the first twelve books between 1995 and 2004, these facts alone are not

dispositive.  The relevant inquiry is whether they have demonstrated proof of independent creation

with respect to *The Rising* and *The Regime* – the targets of Plaintiff's lawsuit.  The uncontradicted

evidence shows that Defendants independently created *The Rising* and *The Regime*.  Specifically,

as both Defendants note (and their factual submissions are undisputed in this case), they became

aware of Plaintiff only after she filed this lawsuit.  (Doc. #113-5; Def. LaHaye Aff. ¶ 11; and Doc.

#113-4 Def. Jenkins Aff. ¶ 9).  To this day, neither Defendant has read *The Final Call*.  (Doc. #113-

5; Def. LaHaye Aff. ¶ 12; and Doc. #113-4; Def. Jenkins Aff ¶ 10).  Moreover, the evidence shows

that Defendants collaboratively wrote *The Rising* and *The Regime* in 2004.  (Doc. #113-5; Def.

LaHaye Aff. ¶ 9; and Doc. #113-4; Def. Jenkins Aff. ¶ 7).  Plaintiff has not supplied any evidence

contradicting these facts.  Although it may be that Plaintiff has challenged Defendants' evidence of

independent creation by generally attacking their credibility, that simply is not a proper justification

for denying summary judgment when there is no triable issue of fact.  This would even be the case

if the court had some doubts about Defendants' uncontested testimony.  *See Miller v. Harget*, 458

F.3d 1251, 1256 (11th Cir. 2006) ("Even if the district court believes that the evidence presented by

one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility

choices.") (citations omitted).  In sum, the evidence produced, even in the light most favorable to

Plaintiff, shows that contemporaneous efforts were made by Plaintiff and Defendants and that those

efforts resulted in allegedly similar works.  Because uncontradicted evidence of independent creation

is sufficient to negate infringement liability, summary judgment is appropriate for that alternative

reason also.

## VI.     Conclusion

For the reasons discussed in this opinion, Defendants' Motion for Summary Judgment (Doc. #113) is due to be granted.   In sum, Plaintiff's allegations contained in the Third Amended Complaint remain precisely that – allegations.   At this stage of the litigation, however, Plaintiff is required to come forward with admissible evidence that satisfies each element of her *prima facie* case.   As discussed above, Plaintiff has not shouldered this burden.   Accordingly, because there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law, summary judgment is appropriate, and judgment in favor of Defendants is due to be entered.[19]

The court will enter an order consistent with this memorandum opinion granting Defendants' Motion for Summary Judgment, denying Defendants' Motion to Strike, and dismissing Plaintiff's lawsuit with prejudice.

**DONE** and **ORDERED** this _____5th_____ day of November, 2009.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[19]Defendants' motion to strike (Doc. #126) Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. #125) is due to be denied.   To the extent that Plaintiff's memorandum presented colorable arguments, the court has addressed those contentions in this opinion.